and just want to remind you of a couple of our traffic rules. We have a traffic light system when the yellow light comes on. You have two minutes left in your argument when the red light signals. We would appreciate your concluding your argument unless you're answering a question from the court. Also we appreciate your giving us record citations when those are appropriate because we have not read the entire record normally speaking. First case of the morning is number 19-50178 General Land Office of the State of Texas v. Department of the Interior. Mr. Walters. Good morning. May it please the court. Ryan Walters of the Texas Public Policy Foundation on behalf of the Appellant General Land Office of the State of Texas. Your Honor, this case does not ask the court to override any scientific determinations within the agency's expertise. Instead, it asks this court to exercise its expertise in interpreting statutes and regulations that the agency was required to comply with when it evaluated the petition to delist the Golden Sheik Warbler. The service conflated the standard of reviewing the petition to delist in the 90-day stage with that of the 12-month stage, which is the merit stage that goes forward once a positive 90-day finding is made. And it also violated the APA's general norms of reasoned decision-making in connections between the facts and actions taken by relying overwhelmingly on threats to warbler habitat when it has refused to comply with its duty to designate critical habitat for almost three decades. The court should either order the agency to proceed with a 12-month review or at least vacate and remand the 90-day finding to be reviewed so that the petition may be reviewed under the correct legal standards. The court could also deal with relief for GLO's additional claims that were dismissed by the trial court earlier in the proceedings on the original listing's compliance with NEPA and for its failure to designate critical habitat at the listing phase by ordering the agency to fulfill those duties in any 12-month review. What would the, it looks to me as if the designation of critical habitat is barred by statute of limitations as the district court held, but what would be the consequence of that? Well, our position is that the agency is required, if it lists a species, it's required to I understand all that, but what would be the practical outcome of that? In other words, no further development west of Austin? Well, the agency could make I'm saying be careful of what you ask for. Well, we understand that, Your Honor, but the agency could make a not prudent determination, which is the only full escape valve from the duty to designate critical habitat. It has not done so. It's required to do that in a published rule. It has spoken in memoranda and in communications about its recommendation that it would not be prudent to designate critical habitat, but it has never found that. So the current state of the habitat determination is from the original listing, which found that it was not currently determinable, which bought the agency some time, but it was required Yes, a couple years, Your Honor, but the agency still did not comply with that and has not revisited any of these issues in the meantime. The services petition review regulations defined substantial information required to find a petition to pass the 90-day stage to be that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted. So there's a lot of cautionary language in that standard. It's not whether the substantial information convinces the agency that it should be granted, that the petition to action should be granted. It's whether a reasonable person objective standard could believe that the measure proposed in the petition may be warranted. So it's a low standard. The various district courts cited by both sides as the authorities in this matter have said repeatedly that it is a very low threshold to get beyond the 90-day standard and advance to a 12-month review on the merits. And at the 90-day level, as long as there is no concern expressed by the agency as to the basic scientific validity of the studies, the information relied on in the petition, then the agency at that 90-day stage is not to use other studies to pick apart the studies in the petition. As long as there is substantial information indicating that a reasonable person could believe that it would be warranted to grant the petition, then the petition should be advanced to the 12-month stage. Would you just go very briefly over the nature of the substantial information that you provided? Yes, Your Honor. The primary information was attached to the petition, and it was a 2015 Texas A&M survey of the relevant literature since the Warbler's listing in 1990 on habitat and population of the Warbler. Given new methodology that has occurred in new methods of estimating Warbler habitat and population, the studies over the last decade show much larger numbers of Warbler population and habitat than originally believed. And those numbers alone, especially because habitat threats are by far the most prominent concern in the reason that the Warbler remains listed and was listed in the first place, even the other factors of the five factors that the agency is to consider in determining whether a species is endangered, even the other factors other than habitat, all at root come down to habitat concerns. Predation was alleged to be exacerbated by the fragmentation of habitat of the Warbler. Obviously issues like the reasonable alternative regulatory measures are also discussed in relation to habitat. And given the much larger population of Warblers, and that's 19 times the population and 5 times the amount of habitat. Well, 19 and 5 means that could be from one Warbler to 19, or it could be from one acre or two hectares to tens. So what are your numbers on those? Well, the Warbler recovery plan had estimated that eight different territories would have to have 3,000 Warblers apiece. So that's a total of 24,000. Now, the studies show over 200,000. There are several studies that estimate over 200,000 Warblers. Now, those are not necessarily within those particular territories broken up like the recovery plan, but they do indicate a much larger volume of Warblers than was estimated to be required for the population to not go into extinction over the next 100 years. Is the theory that the Warblers only breed in these juniper trees? Yes, the juniper trees, which is typically known sometimes as cedar, colloquially. You've got two sections on the panel. Yes, Your Honor. The bark is stripped off for nesting purposes. So it's a mixture of oak and cedar habitat is necessary for the Warbler. They haven't found any in East Texas. That's right, Your Honor. The central Texas, 33 counties in central Texas are Warbler habitat for breeding purposes. So the agency was also required to examine the petition according to whether it described based on available information, past and present numbers of the species and any threats faced by the species. And with respect to the Warbler petition, that's exactly what the petitioners did. In fact, the agency itself said that the Texas A&M survey did represent the most up-to-date status of the scientific literature on Warbler habitat and population. And while the agency does say in its 90-day finding, ROA 112, that that didn't necessarily show positive trends. It could have just been that they weren't estimating the Warbler accurately earlier. And the service admitted that the population estimates are very difficult to determine. But it used this uncertainty to require a higher level of information than is required because the regulations say available information. And if these are the best studies that are available, that you can't just do a census of the Warbler because of the nature of its habitat and its practices, then this violates the service's own regulations. And the Western District of Texas, Judge Yackel, in a recent case earlier this year involving the Bone Cave Harvestman, another central Texas exclusive species, it… Is that the same species that this court dealt with 20 years ago? Yes, yes, Your Honor. It's the same one? Yes. But Judge Yackel, they denied a 90-day petition to the list based on new population and habitat numbers, very similar to what's gone on here with the Warbler. Well, I detect this to be fair. I think there is a possible distinction in the cases because in that case, Judge Yackel said that the service was merely – was trying to place a burden on the petitioner to quantify or give substance to some theory or estimate that even the service itself admitted was non-quantifiable. Yes, Your Honor. But I believe that is what happened in this case as well because the service has said that it itself relied in its five-year review on the studies that were referenced in the 2015 Texas A&M Survey. And they said that that is the best currently available information. And given that, any uncertainty is to be resolved in favor of advancing to the full 12-month review where all the relevant information and any relevant stakeholders with relevant information would be able to examine the studies more critically, which is not permitted at the 90-day stage. Did – as petitioner, what did you offer that was not in their – was it their 2014 or 15 five-year – alleged five-year review? Well, there was a new interpretation of data, which is permitted by the regulations. So new interpretations of data is also a legitimate reason to make a listing revision as well. And I see I'm out of time, Your Honor. I've reserved a few minutes. Thank you. All right. Thank you. Ms. Bennett? May it please the Court. Lisa Bennett representing the state of Texas as amicus curiae. The state's interest here is in ensuring that the service adheres to the process that Congress put in place. And that process is to strike a balance between various public interests, including an interest in obtaining judicial review of Fish and Wildlife Service determinations. Because you just left off with the five-year review, I'd like to go ahead and start there because I believe that's one of the core problems with the 90-day review. So the previous five-year review that the service used as the baseline for its review here was a non-reviewable, non-final agency action. And it cannot control the outcome of the petition process. The Coos County case that's cited in our briefs – it was a Ninth Circuit case – ran through this. Basically, someone tried to seek review – judicial review of a determination that had been made in a five-year review in that case. And the court said, we don't have jurisdiction to do that. This is not a substitute for the interested party petition process. And if you want to mount a challenge about the species status following five-year review, the way you do it is you file a new citizen petition. Another case, the American Forest Resource Council case, clarified that the result of that future rulemaking is not determined by the five-year review. There could be the opportunity to correct errors or to gather additional information. So here, both the agency and also the district court made a number of kind of disparaging comments about this information not being sufficiently new since that last review. But the agency can't be permitted to make all of its determinations that are going to form a baseline in non-judicially reviewable determinations and then reject future citizen petitions, which is the avenue to get judicial review on the basis of those non-reviewable determinations. So that's one of the two core problems with the process that the agency employed here. The other, which has already been touched upon, is simply that the agency applied the wrong evidentiary standard for this threshold stage. And while we don't have precedential opinions here, we do have a wealth of district court opinions from around the country that uniformly use terms like this is not an onerous proceeding, it's not overly burdensome. This is meant to be a threshold stage where the service only asks if a reasonable person may think that the species should either be listed or delisted on the basis of that information. Why do you think there is a dearth of circuit court precedent here? I can't speak to that exactly, but I would guess it's simply because of the fact-bound nature of most of these determinations. It's sort of a question of what was presented in that particular petition. Also, in many of these cases, the vast majority of them, the courts did vacate the 90-day determinations and remand back to the agency, either with instructions to proceed to the 12-month review or to simply revisit their 90-day finding. So in those cases, it would be back in the hands of the agency, and going forward, there would be no reason to appeal. Did most of those cases arise in the context of petitions to list or petitions to delist? There are both, but most of them were petitions to list. That's a really important point about what we're asking here. This process is balancing interests that apply equally for petitions to list or delist. They apply with any species and regardless of any preferred policy position. So what the state is asking is simply for that process that Congress laid out to be adhered to. And there is a case law that we cite in our briefs that confirms these processes that are laid out are not mere bureaucratic hoops to be jumped through. They are the processes that determine when judicial review can be sought. For example, with a 90-day review, there's judicial review only of negative determinations. Same with 12-month reviews. So if the service determines that a 12-month review of a petition that it thinks listing should be warranted, only then does it go forward with notice and comment rulemaking where everyone can comment. So there are specific places where we can get judicial review. And that 12-month negative determination or listing determination, that's the place to hash out the merits of whether the studies lean one way or lean the other. But, of course, the service does have discretion to ignore obsolete scientific studies, but that is not what it did here. Thank you very much. Are you Ms. Yowell or Yowell? Yowell, Your Honor. Thank you. May it please the court, my name is Amelia Yowell on behalf of Federal Appellees. We ask the court to affirm the district court's judgment. I'd like to start this morning with the service's negative 90-day finding and then I'll address the time barred claims. First, I would like to talk about how the general land office's challenge to the 90-day finding is governed by the familiar arbitrary and capricious standard of review. The issue here is whether the service rationally believes that the information in the petition would not lead a reasonable person to believe that delisting may be warranted. The issue is not, as my friends on the other side would like for the court to independently conclude, that the information in the petition would meet that threshold standard. I'd like to first talk for a few minutes about the 90-day threshold standard. The land office argues that this court is presented with a statutory or regulation interpretation question and that is not before this court. Everyone agrees that the proper 90-day standard is the substantial information standard, which is defined in the service's regulation as that information that would lead a reasonable person to believe that the petition action may be warranted. Well, let me ask you just a common sense sort of, at least from my perspective, question. If it turns out that there are 200,000 adult male warblers spread over not one or two, but eight different possible breeding territories, just exactly why does that make your 90-day decision less, let's see, I'm trying to phrase it right, correct that this is not substantial information? And I realize you focus on habitat, but my goodness, that sounds like a lot of birds to me. Of course, Your Honor. So at the 90-day finding stage, the service can take either two tacks. It can credit the scientific information that's presented in the petition and say that that scientific information does not rise to the level of— I mean, seriously, don't laugh at me. I know you're not trying to be impolite or anything, but, I mean, that seems pretty substantial to me. So what's the basis on which you say that's not substantial? Sure, Your Honor. I'm sorry. No, that's okay. I didn't mean to rattle you, but, I mean, what's the basis for that not being substantial? So the service provided two reasons for its position that even assuming the warbler population is larger than the service originally estimated at the time of the listing, it's still not substantial information. And those two reasons are, one, greater population estimates do not necessarily imply recovery. All they imply is that the service—that the 1990 listing was not based—or that the—excuse me. What is it? They do not necessarily imply recovery is what you're—okay. That's correct, Your Honor. The fact that the warbler populations are larger than originally estimated doesn't mean that the warbler populations are growing. It just means that they're larger than the service thought in 1990. Second, even though the populations, again, may be larger than what the service originally thought, that doesn't mean that their habitat is not still threatened and in serious danger of fragmentation from the urban development in this small portion of Texas where warbler habitat is. So for those two reasons, the service found that even assuming that the population studies were valid, they didn't rise to the level of substantial information. I think it's important to note that population numbers alone under the Endangered Species Act do not determine whether a species is endangered. Well, in the Bone Cave Harvest Man case, for instance, I think the number of these—I'll call it a species. We used to call it cave bugs, but I will call it a species—had been found to be dramatically in error, just as it apparently has been here. So I agreed with your honor when you were talking with my friend for the General Land Office that the American Stewards of Liberty case is distinguishable for the primary reason that the district court in that case concluded that the service had required the petitioner to present population studies that the service itself admitted was not scientifically possible. Here, the service didn't say that the petition should be denied because the science wasn't available or the science wasn't possible. It agreed that the population studies were the most comprehensive and best science to date. It just—those population studies themselves did not rise to the level of substantial evidence because, again, they did not indicate recovery. They did not indicate that the warbler was growing. And also, they didn't take into consideration the significant threats to the warbler's habitat. So there's not an issue as to whether the original population studies, because they were built on a different and outdated methodology, might have been wrong? Your honor, if you look at AR442 as well as AR443, you'll see the service repeatedly acknowledging that these population studies are the most comprehensive and best estimates of the warbler population. In fact, the service— You mean the A&M one or the 1991? So the A&M study—it's not actually a study. It's just a compilation of studies. Right. Including Matthewson, which estimated the warbler population to be in the 200,000 range. But the service said that even assuming that those studies were correct and that the populations were larger than what was originally estimated, that that was not enough to rise to the level of substantial information. Again, because they do not indicate that the species is recovering. They simply indicate— What I'm looking at is the word recovering. And as I said, is there not an issue here as to whether the 1990 listing, based on a perhaps outdated methodology, understated the population? Is that an issue? Not at the 90-day finding stage. I understand that. But does the general land office suggest—it seems to me that they suggested that that might have been the case. In the service's 2014 status review, it acknowledged that warbler populations are hard to estimate, that there is some uncertainty with counting the warblers. But again, when it was deciding the petition at the 90-day finding stage, the service credited those studies and even mentioned that they would be using those studies going forward to study the warbler. And it's continued listing. So any uncertainty with the warbler population that there may be was not considered by the service at the 90-day finding stage. Well, but again, if they had raised a question that would lead a reasonable person to think that the 1990 listing had been way too conservative factually, wouldn't that fall within the regulations? Yes, the service has to consider the information presented by the petition, including these higher estimates of population. But again, just because the population numbers are higher than estimated, that doesn't necessarily mean that the warbler should be delisted. The service has to consider five— No, but the 90-day determination doesn't say that. All it says is, hmm, this is something we need to look at. And then the service proceeds to a greater scientific inquiry, I would suppose. And then a notice and comment period, which is pretty essential in species regulation, it seems to me, because the potential effects on property owners who own all of this property in central Texas are quite grave. Yes, Your Honor. So at the 90-day finding stage, the service is allowed to say that even assuming that all the studies in the petition are valid, they don't rise to the level of substantial information. The 90-day standard is a low bar, but it's still a threshold. The petition bears the burden of presenting the substantial necessary scientific and commercial information. The 90-day standard plays an important role in the services management of its resources. The service is inundated with petitions, mostly petitions to list, and it has to decide when to allocate its resources and time to move to that 12-month period. Let me ask you a question about that on two grounds. First of all, counsel for the state of Texas says that, in her view, the vast majority of these 90-day challenges have resulted in remands. You know, just looking at the case law, which I have not had a full opportunity to do yet, number one. And number two, the regulation has just changed to set a somewhat higher bar for a 90-day review, has it not? I disagree that the regulation set a higher bar. The new regulation. Yes, Your Honor. The new regulations say that the petition must be considered by the service in the context of all prior agency actions relating to the species. And in the context of final agency actions, that's when the petition would need to produce new information, otherwise it would be denied. But in this situation, as the state of Texas points out, there is not a final agency action at issue. The 2014 review was not a final agency action. Therefore, even under the new regulations, the service would, as it did here, consider the petition in the context of the 2014 review. Well, okay. Why did Fish and Wildlife promulgate the new regulation then? Your Honor, as many regulations do, the new regulation simply codifies existing practice by the Fish and Wildlife Service. And again, in this situation, the new regulations wouldn't require a heightened review because the 2014 status review is not a final agency action. The service is entitled, under the old regulation and under the new regulation, to consider all the information within its files, as well as its scientific expertise. Indeed, it would be arbitrary for the service not to consider information within its own files. And then one other thing. In answer to my other question, do you have an impression about whether the majority of these cases on the 90-day process have resulted in remand orders? Your Honor, I haven't done an extensive review of all the district court cases dealing with negative 90-day findings. Again, only the negative 90-day findings will make it to the court. And as the state of Texas pointed out, we only have mostly district court decisions. The one circuit court decision is from the Ninth Circuit, the Palouse case. And in that case, the Ninth Circuit upheld the service's negative 90-day finding and held that the service applied the correct standard. And it is our position that the court should hold the same here. The service expressly acknowledged and applied the reasonable person standard in its negative 90-day finding. You can see that in particular at AR 440 and AR 449. As I mentioned before, it credited the population studies and the habitat studies and just held that those studies didn't rise to the level of substantial information, particularly concerning all of the threats that the warbler's habitat faces. To discuss the Beardmore study, which my friend from the General Land Office has talked about, that study said that in order to have recovery, there needed to be 3,000 warbler pairs in each of the eight recovery regions. But the petition didn't provide any evidence that each eight regions had 3,000 pairs. Eight times 3,000 is 24,000. Yes, Your Honor. And if you're taking the position that the A&M study correctly says there are 230,000 adult males, I think is the deal, how do you figure those numbers? So these are geographic regions. So the regions are carved geographically. Do you have a map? Is there a map in the record somewhere that shows what these regions are? I believe there is, Your Honor, but I don't have that on me. Right. Well, if it's ‑‑ I mean, I'm just interested because I know something about the Hill Country. Yes, Your Honor. If you look at AR6781, there is a map showing the habitat in central Texas, and you'll see how isolated that habitat is. It's just, again, 33 counties in central Texas. But to go back to the number of breeding pairs in the eight recovery regions, a study cited in the petition, Aldridge, which you'll find at AR535, says that only two of the recovery regions meets this 3,000 threshold. So what that means is that the warblers are bunching in different recovery regions, but not all eight recovery regions has. They have big cities and little cities. Yes, Your Honor. And was that one of the studies included in the Texas A&M Review? Yes, Your Honor. You can find it cited in the petition at AR63. I don't have the site for the Texas study, but, yes, it was discussed. May I ask you, the other thing I don't want to take from my colleague's time, but my other interest is in the fact that the service has never bothered to designate a critical habitat. Now, and you need to explain to me why that fact shouldn't factor into the significance that we attach to substantial information, because I understand that, you know, in other words, once the warbler is designated as endangered, then it can't be taken. But if there's not a critical habitat, what does that mean to the developers, for instance, who have been steadily moving into West Austin or wherever? Yes, Your Honor. So critical habitat designation is a statutory designation by the service. Critical habitat is a subset of habitat, and it only affects federal land or federal activities. But as the state of Texas itself acknowledges, if you look at ROA 874 and ROA 877, designation of critical habitat could affect development on private property owned in Texas. And, in fact, that's the reason why the state of Texas has repeatedly asked the service not to designate critical habitat. And it is our understanding that Texas still does not wish for the service to designate critical habitat. Well, but since there is a prohibition on taking warblers and the prohibition of taking includes habitat, then without a designation of critical habitat, does this mean that the residential developer can't cut down juniper trees? If the developer would be doing activities that would constitute a take of a warbler, which includes harassment or destruction of habitat, then the developer would need to get a federal permit in order to conduct those activities. So has that been happening over the past 30 years? Your Honor, I don't have the stats on how many permits have been happening. But, yes, if there is any development on warbler habitat for that to occur, if it would result in a take, the developers would need to be required. Because you realize, don't you, that juniper trees are a huge pest to any property owner and, in fact, to the environment. Yes, Your Honor. I don't mean you, but the service realizes that, I trust. Yes, Your Honor. The service understands the nature of ash juniper trees. But, again, the warbler only breathes in this particular type of habitat. Well, he must have found some other place to breathe before the 1830s or 40s when junipers first came to Texas. Your Honor, I can't speak to where the warblers bred before ash juniper came to Texas or when ash juniper came to Texas. What I can tell you is that the service has concluded, and it's not undisputed, that ash juniper is the only habitat where the warbler breathes. And the service's scientific expertise on that information is rational and should be upheld by the court. I see my time is out. Unless there are further questions, we ask that the court affirm the district court's judgment. Thank you. Okay, Mr. Walters. Thank you, Your Honor. I just have a few points in rebuttal. One, on the issue of using information in the service's files, it is true that the service is not required to just look at the face of the petition that is allowed to look at the information in its files, but that's only for background information. The case law does not allow the service. That statement that information in their files can be examined at the 90-day stage has to be harmonized with the other statements in the court cases analyzing the process that say that at the 90-day stage, you can't pit studies against studies. As long as the studies, the information in the petition, meet the minimum scientific viability, which no one questions the Texas A&M Studies basic scientific viability, then you have to accept that information. So, for example, in the Humane Society v. Pritzker, it says if conflicting scientific evidence at the 90-day stage, then a reasonable person might conclude that a 12-month review was warranted. And Center for Biological Diversity v. Kempthorne, the Northern District of California case, it says that at the 90-day stage, where there is disagreement among reasonable scientists, the service should proceed to a 12-month review. Another point is that while the service states the general APA standards of reviewing agency actions, that as long as the agency can articulate a rational basis for its actions, that only applies — that can't apply to overcome a specific, lower, more demanding standard of the agency set forth by Congress and by its own regulations. So in this case, because of the very low burden on petitioners at the 90-day stage, the agency can't fall back on the general APA standards because the APA requires you to follow the statutes. Can I ask you a question? If this were to go to a 12-month review, I suppose the land office or other interested parties would be able to submit information? Yes, Your Honor. It would open it up. And is there other information out there? Well, I personally am not aware of that, Your Honor, but I'm assuming this is a very big issue in Central Texas and Texas A&M has taken the lead on this issue in the past. And I'm sure that we will have what needs to be is all the scientific evidence on all sides from all interested parties, anyone who has anything of value to contribute to this discussion, to go through the actual process to determine on the merits whether the warblers should be delisted or whether it should remain listed. Does anybody question the bias of Texas A&M one way or another? That is, Your Honor, there has been no allegations of bias in this case. Thank you. Okay. Thank you. You're dismissed. Thank you.